STATE of Minnesota, Respondent,

v.

Ross Alan LANDRO, Appellant.

No. C5–92–1618.

Supreme Court of Minnesota.

Aug. 20, 1993.

John M. Stuart, Marie L. Wolf, State Public Defenders, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., Tom Foley, Darrell C. Hill, Ramsey County Atty., St. Paul, for respondent.

TOMLJANOVICH, Justice.

Ross Alan Landro appeals his convictions for first and second degree murder. He argues that his conviction cannot stand because of juror misconduct, the improper admission of rebuttal evidence, and insufficient corroboration of accomplice testimony. We affirm.

Jessie Adams was shot to death during the early morning hours of December 7, 1991 outside of Born's Bar, St. Paul.[1] Appellant[2] and a friend, James Taylor, spent most of the day of December 6, 1991 together. At about noon they met at a friend's house. According to James' testimony, appellant showed him a .22 caliber revolver that he kept in the waistband of his pants. Appellant's testimony differed: he testified that the gun belonged to James. Accompanied by James, appellant purchased some shells for the gun at 2:19 p.m. from a sporting goods store. The purchase of the bullets was corroborated by an employee of the store and a sales record; appellant testified, however, that James had wanted to buy the bullets and that he did not purchase them but was merely lending James the money. James testified that appellant then loaded the gun and put some shells in his pocket.

Around 5:00 p.m., they were joined by James' younger brother, Jeffrey. The three then went to several shopping malls where they either stole things, returned stolen goods for money, or both. Afterward, they bought some beer at a liquor store and stopped at a couple of bars.

At about 10:30 p.m. the three arrived at a friend's house. According to the testimony of the Taylor brothers, Appellant tried to sell the gun for $25. Appellant denied that he had attempted to do so. Testimony at trial indicated, however, that after appellant attempted to sell the gun, the prospective buyer handed the gun to James who tried to take it. At this time, appellant announced that it was his gun, took it and tucked it into his pants. The three left at approximately 11:00 p.m. They went to a bar where James almost got into a fight. Next they went to the home of another friend. An argument developed between James and this friend. According to the friend's mother, appellant helped escort James out and apologized for the behavior. They left about midnight. They arrived at Born's Bar at about 12:30 a.m. Jesse Adams was at Born's with Cheryl Clark, the mother of his fiancee. Appellant and the Taylors joined a group of friends. The bartender testified that their group was loud and described a wrestling match involving the Taylors shortly before closing that resulted in a broken glass. After the bartender took the Taylors' drinks away, James accused Adams and one of Adams' friends of having stolen them.

---

1. Adams was African American. Generally the race of the key players in a crime is not relevant. In this case, however, there was some evidence indicating that the races of various parties and ensuing racial conflict precipitated the crime.

2. Appellant is Native American; it appears from the record, however, that he is sometimes mistaken as Caucasian.

At closing time, appellant's group left first, Adams and Clark were close behind. At this point, the testimony of the state's witnesses diverged. According to James, their group was out on the sidewalk and a black female—presumably Cheryl Clark—continued to make comments directed at them as she had earlier in the bar. James claimed that he told her to "get the f___ out of here," and that Adams then took off his coat and started to come after James.

Clark testified differently. She said that a group of whites—presumably the Taylor group—confronted them 10–15 feet from the front door and asked them, "What the hell you doing in this neighborhood?" She testified that then one man—presumably James Taylor—emerged from the group. Adams told the man to leave him alone. In response the man began swinging at Adams. Clark's testimony continued that Adams, with his hands at his sides, said he did not want any trouble, but that the man responded, "I'll f___ you up, nigger." Clark continued that a second man, taller and thinner than the first, then joined the first man.

A fight broke out and Clark went to her car to get a mallet. When she returned, she said that the taller man said "I got something for you, too, bitch." She said that he opened his jacket and that she saw the butt end of a gun. At trial, Clark identified appellant as this man. Previously, however, she had identified James Taylor as the man with the gun. She returned to the bar to get help and was pounding on the windows when she heard the firing of two shots. The Taylors returned to the bar a few minutes later. Clark originally identified them as the two involved in the shooting. At trial, however, she said she was no longer certain.

The Taylor brothers told a different story. They described how Adams and James fell to the ground and started wrestling, with Adams on top. They testified that neither Adams nor James had weapons. Jeff testified that he was standing near his brother's head and watched Landro take out his gun and shoot Adams three or four times. After the shots were fired, James pushed Adams off. The Taylors testified that appellant then shot Adams one more time. They testified that appellant ran towards his car and they went back to the bar.

Appellant's testimony differed. He testified that when he arrived at Born's bar with the Taylors, he ordered a pitcher of beer. Tired of the commotion that seemed to follow James, he opted instead to spend some time visiting with other people he knew. He testified that he heard the Taylors fighting and heard a glass break. He decided to leave, placed his pitcher on a table and announced that he was leaving. He testified that the Taylors told him that they would be out in a minute.

Appellant testified that he next went to his car and smoked a cigarette while he waited for the Taylors. He testified that he thought he remembered hearing something that sounded like fighting and gun shots, assumed that the Taylors were involved—because James Taylor, according to appellant's testimony, was always causing trouble—and decided to leave.

Upon leaving, appellant testified that he drove to the house of a friend, Wanda Peterson. She testified that when appellant arrived, he was nervous and **had a gun.** Using her telephone, he telephoned some friends to find out what had happened. He talked with a friend who told him that the Taylors were saying that he, appellant, had shot someone. Appellant testified that at first he thought it was a joke, but then he heard the voices of the Taylors in the background. Appellant testified that Jeff was saying that he would not go to jail for something he had not done; James was saying "Ross did it, Ross did it." Appellant denied having done so and got off the phone.

During the next time period, there seems to be a hole in appellant's story. In his original statement, he testified that he had only been at Petersons' house a minute. At trial he elongated this to an hour or more. In any event, he testified that he next drove to the home of yet more friends. When he arrived there, a cab was arriving;

the Taylor brothers came out of the house and Jeff got into the cab. The driver's records establish that this was at about 3:19 a.m.—James got into appellant's car; appellant asked him what had happened. Appellant testified that James told him, "Oh man, I got some problems," but "This guy ain't got no problems no more." James did not want to discuss the shooting further.

Appellant and James drove to a friend's house, where they spent the rest of the night. Appellant testified that James was acting "weird, nervous [and] scared," and at one point said something about appellant having shot someone. In the morning, appellant agreed to give James a ride to Minneapolis. When he left the next morning, Appellant testified that he asked the friend to give him some clothing for warmth and she did so. Appellant was taken into custody while leaving the house.

The grand jury indicted appellant on January 22, 1992. The trial began on June 1, 1992. Both of the Taylors testified. On June 10, 1992, after the evidence had concluded but before closing arguments and jury instructions, one juror, Dan Williams, telephoned a local anchorperson, Diana Pierce. Williams had talked to her earlier during the trial and told her that she would find the case "very interesting." During the telephone call and previous conversation, he did not discuss the case at length, but rather suggested that she obtain a transcript. The comments he made about the substance of the trial were limited to his expressing skepticism as to the testimony of the defense investigator. He also testified that he thought that the case raised similar issues to the Rodney King incident and trial. The acquittal and subsequent riots had been publicized shortly before this trial began. He told Pierce the names of the defendant, the judge and the attorneys. The conversation lasted about 10 minutes. At the subsequent hearing, Pierce testified that Williams said, "I wanted to talk to you about the case * * * going on in St. Paul that I had briefly mentioned two weeks prior." He also told her that he was willing to make himself

available for an interview after the verdict was returned which could be as early as the following day. Pierce testified that she did nothing in response to the call except telephone the court two days later to inform it of the conversation.

On June 11, 1992 the attorneys gave their closing arguments, the jury was instructed, then sequestered at 11:54 a.m. Juror Williams was elected foreperson. The jury returned a verdict of guilty of first and second degree murder at 4:57 p.m. Appellant was sentenced that afternoon.

Appellant moved for a new trial based upon juror misconduct. The court held a hearing at which Williams, Pierce and ten of the other jurors testified. Ten of the jurors were called and none testified that they knew Williams had contacted Pierce. The court denied the motion, ruling that although it was juror misconduct for Williams to have contacted Pierce, it had not prejudiced the verdict.

## I.

The first issue we address is whether juror misconduct prejudiced the verdict. Juror Daniel Williams contacted an anchor for a local news station and mentioned that there was an interesting case going on in Ramsey County, and that the case had possible racial overtones. The anchorperson testified that she did nothing in response to Williams' comments. Williams telephoned her again on the evening of June 10, 1991—after the evidence was complete but before closing arguments—and suggested that she look into the trial. Williams does not deny that he made this call and testified that he may have told the anchorperson about the possible racial overtones and the methods of the investigator for the defense.

In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial. * * * The presumption is not conclusive, but the burden rests heavily upon the Government to

establish * * * that such contact with the juror was harmless to the defendant.

*Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). It is misconduct for a juror to contact the media during the trial about the trial. The decision to grant a new trial based upon juror misconduct rests within the discretion of the trial court and will not be reversed unless there is an abuse of discretion. *Stayberg v. Henderson,* 277 Minn. 16, 21, 151 N.W.2d 290, 293 (1967).

When juror misconduct is alleged

[t]he trial court should not decide and take final action *ex parte* on [such] information * * *, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

*Remmer,* 347 U.S. at 229–30, 74 S.Ct. at 451. We mandated this practice in *Schwartz v. Minneapolis Suburban Bus Co.,* 258 Minn. 325, 104 N.W.2d 301 (1960). The trial court acted properly when he heard about the misconduct: he held the *Schwartz* hearing to determine the nature of the misconduct and whether it had caused prejudice.

■ In reviewing the trial court's decision, this court considers the following factors: (1) the nature and source of the prejudicial matter; (2) the number of jurors exposed to the misconduct; (3) the weight of evidence; and (4) the likelihood that curative measures were effective in reducing the prejudice. *State v. Cox,* 322 N.W.2d 555, 559 (Minn.1982).

In this case, there is no allegation that Pierce exerted influence or even attempted to exert influence on either Williams or the jury as whole. Ten of the eleven remaining jurors testified at the *Schwartz* hearing that they knew nothing about the contacts between Williams and Pierce. Thus the first and second factors indicate that the juror misconduct was not prejudicial.

The third factor is the weight of the evidence properly before the jury. In ruling on the new trial motion, the trial court

ruled that the evidence against the appellant was "overwhelming."

Our review of the record leads us to conclude that it was not an abuse of discretion for the trial judge to have determined that the state's case was overwhelming. There was much testimony linking the defendant to the crime, most notably Wanda Peterson's testimony that when appellant arrived at her home shortly after the time of the murder, he had a gun. Furthermore, during his examination, appellant's story as to where he had been and what he had been doing immediately after Adams was shot kept changing and was internally inconsistent. It was reasonable for the trial judge to conclude the evidence against Landro was overwhelming.

As to the fourth factor, the trial judge did not take curative measures because he did not know about Williams' misconduct until after the return of the verdict. Thus, none of the four factors tend to show that the juror misconduct prejudiced the verdict. The trial court did not abuse its discretion in denying the motion for a new trial based on the juror misconduct.

II.

■ Defendant also argues that his conviction should be reversed because accomplice testimony was improperly admitted at trial. Convictions may only rest upon the testimony of an accomplice if that testimony is corroborated. The relevant statute reads as follows:

A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Minn.Stat. 634.04 (1992). The test for determining whether someone is an accomplice is whether that person could have been indicted and convicted for the crime for which the accused is charged. *State v. Jensen,* 289 Minn. 444, 446, 184 N.W.2d 813, 815 (1971). The parties do not dispute that James Taylor is an accomplice: he was

indicted and pleaded guilty to second degree murder for his role in these events. A large portion of the corroboration of James Taylor's testimony was contained in the testimony of his brother Jeff. The issue before us is whether or not Jeff Taylor was an accomplice.

Jeff Taylor was not an accomplice in this case. The grand jury did not indict him. Thus the threshold requirement for accomplice status has not been met. Because Jeff was not an accomplice, his testimony was properly used to corroborate the testimony of his brother, James, who was an accomplice. His testimony adequately corroborates the testimony of James. Corroborating evidence is sufficient "if it restores confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial degree." *State v. Lemire*, 315 N.W.2d 606, 610 (Minn.1982). This test is easily met. Jeff testified that appellant shot Adams. This corroborates his brother's testimony and points to appellant's guilt.

■ Appellant also argues that we should rule that Jeff Taylor's testimony should not be allowed to corroborate James Taylor's testimony because of their familial relationship. We do not believe that we need to carve out such an exception to the accomplice testimony statute. Of course, family members might be biased in favor of other family members. We believe, however, that cross-examination is an ample tool by which to expose the presence of possible bias to the jury.

### III.

■ Defendant claims that his trial was prejudiced by the improper admission of evidence by the state on rebuttal. The state counters that this issue is not properly before us because it was not objected to at trial and does not involve a plain error affecting substantial rights or an error of fundamental law. We agree with the state. The issue is waived on appeal. Minn.R.Evid. 103(a)(1), 103(d); Minn. R.Crim.P. 31.02.

In sum, we believe that appellant received a fair trial. The trial judge properly concluded that the juror misconduct did not prejudice the verdict. James Taylor's testimony was properly corroborated by the testimony of Jeff Taylor. The evidentiary issue was not properly objected to at trial and is waived.

Affirmed.