**STATE of Minnesota, Respondent,**

v.

**Lawrence Burton MILLER, Appellant.**

No. CX–96–2434.

Supreme Court of Minnesota.

Jan. 15, 1998.

John M. Stuart, State Public Defender, Patricia P. Rettler, Sp. Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, Atty. Gen., Susan Gaertner, Ramsey County Atty., Mark Nathan Lystig, Asst. Ramsey County Atty., Karen A. MacLaughlin, Certified Student Atty., St. Paul, for respondent.

## OPINION

ANDERSON, Justice.

On May 10, 1996, the body of 73-year-old Lorraine Miller was found on the bathroom floor of her St. Paul, Minnesota home. She had been shot twice in the head. Three days later, appellant Lawrence (Larry) Burton Miller, Lorraine Miller's 42-year-old son, was arrested for the murder of his mother. Both before and after he was arrested, Miller gave statements to St. Paul police officers. Although he initially denied having anything to do with his mother's death, Miller ultimately admitted that he was present when she was shot. He claimed that he had given a .22-caliber pistol to his mother because she wanted to commit suicide. Miller claimed that, while at her home, he found the pistol on the floor of her bedroom and that, when he picked it up, the pistol accidentally discharged and shot his mother in the back of the head.

Miller sought to have all of his statements to the police suppressed, claiming that the police obtained them in violation of his *Miranda* rights. The Ramsey County District Court ordered all of the statements admitted. During trial, a witness mentioned on defense cross-examination that Miller had prior felonies. The court sustained defense counsel's objection to the testimony and instructed the jury to disregard the statement, but denied

defense counsel's motion for a mistrial. Two other witnesses testified without objection that their first reaction to the news of Ms. Miller's death was to believe that Miller had killed her. The jury found Miller guilty of first-degree murder, and the court sentenced him to life imprisonment.

On appeal, Miller raises two grounds for reversal. He first contends that the statements he made to the police should have been suppressed because they were obtained in part in violation of his *Miranda* rights and in part in violation of the recording requirement of *State v. Scales* [1]. Second, he asserts that the district court erroneously admitted certain witness testimony regarding the likelihood that he killed his mother, his bad acts, and his prior felonies, thus denying him a fair trial. Because we find no grounds for reversal, we affirm.

Miller's childhood was far from ideal; his parents fought with each other and belittled him. Nonetheless, Miller maintained regular contact with his mother and visited her weekly to run errands and help with chores. He and his sister Leslie Miller received monthly payments from a family trust fund until March 1996, when the payments to Miller stopped. At the time of the murder, Miller was working as the assistant manager of the Subway sandwich shop in the Har Mar Mall in Roseville. He had also owned and operated a gun store in the past.

Likewise, Miller's criminal history provides necessary context for the investigation of his mother's murder and his trial. By 1996, Miller had had significant contact with the criminal justice system. In 1984, he had been convicted of third- and fourth-degree criminal sexual conduct and served time in prison. He had also been arrested at least three other times. In addition, he had been brought in for police questioning about several other crimes.

On the morning of Friday, May 10, 1996, Ms. Miller's house-cleaner found her body on the floor of her bathroom. Ms. Miller had been shot twice in the head. The shot that killed her entered at the nape of her neck.

1. We held in *State v. Scales* that custodial interrogation, including information about *Miranda* rights and the waiver of those rights, must be recorded when it occurs in a place of detention. 518 N.W.2d 587, 592 (Minn.1994).

She also had a graze along the right side of her head. At about 6:00 p.m. that same day, Miller drove up to his mother's house. A uniformed Neighborhood Assistance Officer was on duty and asked Miller where he was going. Miller replied that he was going inside to see his mother. The officer told him that his mother was dead and that he could not enter her house. The officer then suggested that Miller contact Sgt. Robert Weston of the St. Paul Police Department, who would provide more information about his mother's death.

Soon thereafter, Miller called Sgt. Weston, who invited Miller to come to police headquarters to discuss his mother's death. Miller agreed to talk to Weston and arrived at the station with his wife Mary Ann at about 7:30 p.m. Weston met with Miller and his wife for about an hour and a half. At this time, the police had no suspects and did not record the interview. Miller informed Weston that he owned a 12-gauge shotgun, and Mary Ann added that her 13-year-old son, who lived with them in West St. Paul, owned a .22-caliber rifle that he used for Boy Scouts. At trial, Weston described Miller's mood that evening as "inquisitive and jovial at times."

Two days later, on Sunday, May 12, Sgt. Weston called Miller at work and asked him if he could come again to the police station to discuss his mother's death. Miller agreed, and later admitted at the Rasmussen hearing that he went to the station of his own free will. Weston asked a fellow homicide investigator, Sgt. Neil Nelson, to assist in the investigation. Miller was at the police station from about 12:45 p.m. until about 4:30 p.m., and Sgt. Nelson tape-recorded the entire interview. Although Miller became a suspect during the May 12 interview, at no point that day did he receive a *Miranda* warning.

At the beginning of the May 12 interview, Miller asked Sgt. Weston whether he was under arrest. Weston told him he was not, adding, "[i]f you were, I'd have given you your rights." Before Weston asked Miller any substantive questions, he gave Miller a questionnaire to fill out. Weston explained at trial that this questionnaire was designed to "detect deceit" by asking Miller about his

knowledge of and involvement in his mother's death. Miller testified at the Rasmussen hearing that he felt compelled to fill out the questionnaire because Weston had given him a "strong impression" that he had to comply, even though Weston told him that skipping a question was not a "strike" against him. Miller also testified that he did not feel free to leave at any time, in part because the officers went to great lengths to make him feel comfortable by bringing him cans of pop and allowing him to smoke. Miller was allowed to use the restroom several times and was also permitted to call his wife twice.

Miller took over an hour to complete the questionnaire. After he finished, he spontaneously explained to the two officers where he had been on Wednesday evening, May 8. He told them that after work, he dropped off a co-worker at the co-worker's home, shopped for a day planner, picked up his wife, and then went shopping with her. He initially maintained that he had not seen his mother at all during the week before her death. Later in the interview, though, he revealed that he had been at his mother's house on Tuesday evening, May 7. Miller stated that on the 7th, he entered the house and called out to his mother. Not hearing any response, he looked around the house and discovered her lying motionless on the bathroom floor. He immediately fled the house in panic. Miller repeatedly rejected the officers' suggestions that his mother had committed suicide and said the odds of her having committed suicide were "slim to none."

Miller never requested or attempted to leave the police station during the May 12 interview, although he and Sgt. Nelson discussed how long the interview would last. Nelson first mentioned the issue, asking how Miller was doing "timewise." Miller responded by asking how much longer the interview would last. Nelson then told him they were "[g]etting close to being done." Later, after Miller had admitted that he had been in his mother's house and had seen her on the bathroom floor, he then asked whether he would be going home soon. Nelson responded, "let's talk for a while yet." Later, Miller asked if he could call his wife. He

telephoned her, and during their conversation said "they are trying to brainwash me that I did something." He added, "if I stay here much longer I may not be going home period."

After Miller got off the telephone with his wife, he asked whether he would be able to leave soon because he was "really stressed out" and wanted to go home. After he agreed to talk to the police at another time, the officers ended their questioning. Miller did not leave the police station immediately; instead, he kept the conversation going, telling the officers that he felt he had been coerced. Sgt. Nelson answered that he had not tried to put words in Miller's mouth and that "[b]y no means, ever, did I want you to say anything that wasn't the absolute truth." The interview ended around 4:30 p.m., and Nelson escorted Miller out of the building.

As Miller was walking out of the police station, he asked Sgt. Nelson what direction the investigation would take. Miller and Nelson stopped at the parking lot of the station and continued talking for approximately 20 or 30 minutes. This discussion was not tape-recorded, but Nelson testified about the conversation at both the Rasmussen hearing and trial. Nelson told Miller that the police would determine how and why his mother had been killed. Miller then stated that he did not understand why the reason his mother had been killed mattered to the police. Nelson explained that there were different "scenarios" of killing and contrasted premeditated homicide, unintentional homicide, self-defense, and mercy killing. Nelson testified that Miller listened intently throughout his description of the four examples. As Miller left, he said that he was going home to "do some soul-searching."

The following afternoon, Monday, May 13, Sgt. Nelson and another police officer went to the Subway sandwich store where Miller was working and arrested him for the murder of his mother. After Nelson read Miller his *Miranda* rights, Miller asked Nelson whether he thought an attorney was "necessary." Nelson immediately stated that he would not ask Miller any questions because he had inquired about an attorney. Nelson also explained that if Miller subsequently wanted to talk with the police, Miller would have to reinitiate the conversation by stating explicitly that he wished to speak without an attorney present. At trial, Nelson testified that he had wanted to "play it safe" and not ask any additional questions. Nelson tape-recorded the arrest, the drive from Subway to police headquarters, and the entire interrogation that followed. At no point during the arrest or interrogation was Miller handcuffed.

When they arrived at the police station, Sgt. Nelson placed Miller in a small windowless interrogation room. Miller's wife, who had been at the station for an interview, joined them. Miller then asked Nelson how he should decide whom to call. Nelson responded that he could not "initiate conversation" with Miller and that he could not give Miller any advice. Miller responded, "[o]k, but I'm starting this conversation with you." After asking a series of questions about the booking process, visiting hours, and the county jail, Miller then asked Nelson what his options were. Nelson repeated several times that he could not talk to Miller about his options because Miller had mentioned an attorney. Nelson reiterated, "you said you wanted an attorney present and I am not gonna skirt that unless you choose to talk to me and, and say, 'I understand my rights. I want to talk to you without an attorney.'" Soon after, Miller requested to talk with the officers, saying "I'd like to exercise that option." Miller also asked his wife to leave the room.

Miller then began to discuss with Sgt. Nelson and Sgt. Weston the circumstances surrounding his mother's death. He explained that his mother had wanted to end her life because she was not physically or emotionally well. In the month before her death, she had asked for her son's help to commit suicide. In response to her request for help, he bought a .22–caliber pistol—an "inexpensive junky import"—and placed it in the nightstand beside her bed so that she could use it. After work on Tuesday, May 7, Miller went to his mother's house and discovered that she had shot herself. She was staggering in the bathroom when Miller walked in, and she dropped the pistol. Mil-

ler picked it up. When he did so, the pistol accidentally discharged, and the bullet hit his mother in the back of the head. Miller told the officers that he panicked, fled the house with the pistol, drove to the High Bridge, and threw the pistol over the railing into the Mississippi River. Later in the interview, he admitted that his mother's suicide attempt could have occurred on Wednesday, May 8, rather than on Tuesday the 7th.

Sgt. Nelson proceeded to ask whether Miller had given his statement knowing that he could have had a lawyer present. Miller answered that he understood his rights. Nelson also asked whether Miller had voluntarily reinitiated the conversation. Miller acknowledged that he had reinitiated the conversation of his own free will, that he did so after consulting with his wife, and that the police had not prompted him to seek her advice. He also agreed that Nelson had made no promises or threats to induce him to talk. Toward the end of the interview, after Miller and his wife had consented to searches of their house and cars, Nelson yet again asked a similar series of questions. Miller again agreed that he could have had an attorney present but chose not to, and that he chose to speak with the police voluntarily. Finally, Nelson told Miller that he would like to talk to Miller the following morning, after the police had searched his house, but added, "if you want to say no in the morning, if you want to say no now, that, it's always been your right to stop this conversation." Miller answered "fine by me" and was taken to the jail.

Sgt. Nelson interrogated Miller again the next morning, Tuesday, May 14. This interrogation was also recorded. When Nelson came to the jail to meet with Miller, Miller initially expressed concern whether he had made the right decision in agreeing to talk to Nelson the day before. Nelson stated, "you're well aware that you, you don't have to talk to me, right?" Nelson then asked a sequence of questions like those he had asked the day before to find out whether Miller voluntarily sought to talk with him. Miller did not mention an attorney and quickly agreed that he would go with Nelson to the police station to talk some more. At

the station, Sgt. Weston joined them. Miller read a form listing his *Miranda* rights and initialed the form to signify that he understood those rights. Again Nelson asked whether Miller wanted to talk to the police without an attorney present and whether Miller understood that the police were not making any promises or making any threats to induce him to talk. Miller responded that he had voluntarily spoken with the police the day before and that he was voluntarily agreeing to speak to Nelson and Weston at that moment.

Toward the end of the interview, Miller's answers to some of Sgt. Nelson's questions made Nelson suspect that Miller had met with someone at the jail the night before. Nelson asked Miller whether he had met with an attorney. Miller admitted that he had. He explained that at about 10:00 p.m., a cousin who was an attorney and another person visited him unexpectedly. They talked for about 10 or 15 minutes, and the cousin told Miller not to talk to anyone about the case. Miller then told Nelson he believed he had two options at that moment: to have an attorney or to ask Nelson to talk. He told the officers, "it would probably, and I stress probably, be in my best interest at that point to choose option B which was to start talking to you." Miller then left the interrogation room to use the restroom, Nelson made a telephone call, and Sgt. Weston went to get Miller a Pepsi.

The cassette ran out at that point, and thus the final 45 minutes of the May 14 interrogation were not recorded. Sgt. Nelson testified that he had assumed the final portion of the interrogation was being recorded. He had placed a new cassette in the slot in the double tape recorder for tape one, thinking that it would automatically begin recording on the first tape after the second tape ran out. In fact, the tape recorder did not operate this way—it stopped at the end of tape two and had to be restarted manually on tape one.

Sgt. Nelson testified at trial that during the unrecorded portion of the interrogation, he told Miller that his mother's death could look like a premeditated murder or a crime of passion. He also gave Miller copies of the

first-, second-, and third-degree homicide statutes to review. Nelson testified that while Miller examined the statutes, the police department received a fax from the medical examiner's office disclosing that the bullet that hit Miller's mother in the back of the head had entered at a flat path. This fact was inconsistent with Miller's account of the pistol's accidental discharge. Nelson confronted Miller with this new information and stated that the crime appeared to have been premeditated. Miller nonetheless continued to insist that the pistol had discharged accidentally. Nelson also testified that at some point during the unrecorded portion of the interrogation, Miller stated he "planted" the pistol in his mother's nightstand.

In early July 1996, a Ramsey County grand jury indicted Miller for first-degree murder. The district court held a Rasmussen hearing on August 12 at which Miller testified. Defense counsel moved to suppress all of Miller's statements to the police, contending that they were obtained in violation of *Miranda*. The court, however, ordered that all of Miller's statements were admissible.

Miller's trial began on August 19, 1996 and lasted until September 6, 1996. The state presented testimony from 29 witnesses. Miller focuses, however, on the testimony of three of the state's witnesses, all of whom painted a negative picture of Miller and his relationship with his mother. Charleen Fenick, Ms. Miller's insurance agent for more than 12 years, testified about harsh comments Miller had made about his mother. Fenick and Miller had a telephone conversation in January 1996 during which Miller called his mother a "bitch" and said that "he wished she would die already." Fenick told him that he was being "pretty mean." Miller replied that she did not have to grow up with Ms. Miller for a mother. Fenick testified that after this conversation, she believed that Miller truly hated his mother. She testified that because of this conversation, her first thought when she heard that Ms. Miller had been killed was "I wonder if Larry finally killed her?" Fenick also testified that she told her co-workers, "I bet Larry did it."

Defense counsel did not object to any of Fenick's testimony.

Leslie Miller, Miller's sister, also testified that her initial reaction to her mother's death was to believe that Miller had killed her. Within the last year of their mother's life, Miller asked his sister many questions concerning their parents' finances and once made what she believed at the time was a joke: " '[w]ell, if we just got rid of both of them we'd have everything.' " She testified that when Miller called her to tell her that their mother had been killed, "I already knew when he called me on Friday night that I felt like he had killed her anyway. * * * I don't know why I felt that; I just did." Defense counsel did not object to any of these statements.

Karen Thomas, the medical caregiver for Miller's disabled aunt, also gave negative testimony about Miller. Miller's father served as one of the aunt's legal guardians. Thomas testified on defense cross-examination that in May 1996, Miller's father was planning to turn over some of his guardianship responsibilities to Miller. Thomas then stated, "I had taken objection to that because I had known of previous felonies of [Miller's]." Defense counsel immediately objected to the testimony about Miller's criminal record. The court sustained the objection and instructed the jury to disregard Thomas's statement. Later that day, defense counsel moved for a mistrial based on Thomas's testimony, which counsel characterized as nonresponsive and highly prejudicial. The court denied the motion based on the timely instruction to the jury. As a precautionary measure, however, the court did instruct two subsequent witnesses who knew about Miller's criminal record that they could not mention his criminal history unless directly asked about it. Thomas also testified on direct examination that Miller's mother had purchased a television set for the aunt and had given it to Miller to send, but Miller had failed to send or deliver it until Thomas contacted him. Defense counsel did not object to this portion of Thomas's testimony.

Sgt. Nelson and Sgt. Weston testified about their interviews with and interrogation of Miller. The jury listened to the tapes of

the interviews and interrogations and followed along with a transcript. Sgt. Nelson also testified about the statements Miller made that were not recorded. Several other witnesses described Miller's financial situation in the months before his mother's death. A Norwest Bank trust officer testified that Miller had received disbursements from a family trust for several years, but that he had stopped receiving payments in March 1996. Miller's landlord testified that Miller was about $5,000 behind in his rent at the time of his mother's death.

Several witnesses testified about Miller's incriminating statements and behavior during the week before his mother's death. Two co-workers at Subway testified that Miller had discussed with each of them whether they thought a .22–caliber gun could kill someone. In addition, another co-worker testified that he told Miller that a .22–caliber gun could kill an animal. He further testified that he had seen what he believed was a .22–caliber rifle in a case in the back seat of Miller's car when Miller gave him a ride home from work shortly after 5:00 p.m. on Wednesday, May 8. In addition, a firearms expert from the Bureau of Criminal Apprehension attempted to link the .22–caliber rifle belonging to Miller's stepson with the crime scene. After firing test rounds from the rifle, the expert compared them to bullets recovered from Ms. Miller's head and the wall of her bedroom. He concluded that the bullets were consistent, but he could not say definitively that they were fired from the same gun.

On September 6, 1996, the jury found Miller guilty of premeditated first-degree murder. The court sentenced Miller to life imprisonment. Miller appealed directly to this court and argues that (1) his statement on May 12 should have been suppressed because he was not given a *Miranda* warning despite being in custody; (2) his statements on May 13 and May 14 should have been suppressed because he had invoked his right to counsel; (3) all of his statements should have been suppressed because he did not make them voluntarily; (4) his statement on May 10 as well as portions of the May 12 and May 14 statements should have been suppressed be-

cause the failure to record them violated *State v. Scales,* 518 N.W.2d 587 (Minn.1994); and (5) certain trial testimony regarding the likelihood that he killed his mother, his bad acts, and prior felonies was admitted in error.

I.

We first address Miller's claim that his May 12 statement should have been suppressed because he was subject to custodial interrogation without receiving a *Miranda* warning. In *Miranda,* the United States Supreme Court recognized that under the Fifth Amendment, a criminal defendant has the right not to incriminate himself and to be informed of that right. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The right to a *Miranda* warning attaches only during custodial interrogation. *Id.* The determination of whether a suspect is in custody is an objective inquiry—would a reasonable person in the suspect's situation have understood that he was in custody? *State v. Hince,* 540 N.W.2d 820, 823 (Minn.1995). If a suspect has not yet been arrested, a district court must examine all of the surrounding circumstances and evaluate whether a reasonable person in the suspect's position would have believed he was in custody to the degree associated with arrest. *State v. Champion,* 533 N.W.2d 40, 43 (Minn.1995) (citing *State v. Rosse,* 478 N.W.2d 482, 484 (Minn.1991) (further citations omitted)). An appellate court reviews a district court's findings of fact for clear error. *Hince,* 540 N.W.2d at 823. It makes an independent review, however, of the district court's determination regarding custody and the necessity of a *Miranda* warning. *Id.*

In this case, the district court concluded that a reasonable person in Miller's situation would not have believed he was in custody on May 12. We agree. We find significant that as soon as Miller arrived at the police station, he took steps to assure himself that he was not in custody: he asked Sgt. Weston whether he was under arrest. Weston told him that he was not under arrest and that if he were, he would have received a *Miranda* warning. At no time did the police tell Miller that he had to remain for questioning or

complete the questionnaire. Although Miller testified that he felt he had to finish all of the questions because Weston had given him the "very strong impression" that it would be "in * * * everybody's best interest" for him to stay at the police station to complete it, his freedom to leave was never conditioned on completing the questionnaire or remaining for questioning.

Moreover, Miller's behavior throughout the interview belies any contention the interview was the functional equivalent of an arrest. During a telephone call with his wife, he stated "I don't know what to do and they're not in any big rush to let me go. * * * But if I stay here much longer I may not be going home period." Miller plainly believed at that moment he would be able to leave so long as he left in the near future. Indeed, this belief was borne out moments later when he asked Sgt. Nelson and Sgt. Weston if he could leave soon because he felt "really stressed out." In response, the officers brought their questioning to a close. The officers' willingness to end the interview once Miller expressed the wish to leave reinforces our conclusion that a reasonable person would not have believed that he was in custody at that point.

Despite protesting that he wanted to leave, Miller nevertheless prolonged the encounter by asking Sgt. Nelson and Sgt. Weston questions seemingly calculated to induce them into revealing how much they knew about the crime and what their subsequent investigation strategy would be. Clearly, he did not fear that the officers would prevent him from leaving. Miller's obvious interest in extending his time at the police station belies his contention that he felt he could not leave. Not only would a reasonable person not have believed himself to be in custody, but Miller himself clearly did not believe that he was in custody. We conclude that Miller was not in custody on May 12, that the police were not required to give him a *Miranda* warning, and that Miller's statement that day was properly admitted.

## II.

■ We next consider whether Miller invoked his right to counsel while in custody on May 13 or May 14 and, if he did so, whether he voluntarily waived that right. *Miranda* guarantees that a person in custody has the right to consult with an attorney at any point during police interrogation. *Miranda,* 384 U.S. at 470–71, 86 S.Ct. at 1625–26. Once a person in custody invokes his *Miranda* right to counsel, all police interrogation must cease. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). The determination of whether a defendant has invoked the right to counsel is critical, because the police are not required to stop the interrogation unless the defendant's invocation of counsel was unambiguous. *Davis v. United States,* 512 U.S. 452, 461–62, 114 S.Ct. 2350, 2356–57, 129 L.Ed.2d 362 (1994); *State v. Jones,* 566 N.W.2d 317, 323 (Minn.1997). On review, an appellate court will uphold a district court's determination unless it was clearly erroneous. *State v. Johnson,* 463 N.W.2d 527, 532 (Minn.1990); *State v. Anderson,* 396 N.W.2d 564, 565 (Minn.1986).

### A. Invocation of the Right to Counsel on May 13

■ The state argues that Miller did not expressly invoke his right to counsel on May 13 and therefore the police were not obligated to suspend their questioning. The district court, however, found that after Miller was given his *Miranda* warning, he "questioned Sergeant Nelson about his right to an attorney." The police officers clearly treated Miller's question about whether an attorney was "necessary" as an invocation of his right to counsel and did not question him. Indeed, Sgt. Nelson repeatedly told Miller that once Miller had mentioned an attorney, he had to cease all questioning and could not continue talking with Miller unless Miller reinitiated conversation and voluntarily and explicitly agreed to speak without an attorney present. The officers' cautious approach was laudable, and they complied with both the letter and the spirit of the Fifth Amendment. The district court did not err in concluding that Miller invoked his right to counsel on May 13.

## B. Waiver of the Right to Counsel on May 13

Because we conclude that Miller did invoke his right to counsel on May 13, we must examine whether he voluntarily waived that right. Once a defendant invokes his right to counsel, he may subsequently waive that right by reinitiating conversation with the police. *See Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85; *State v. Howard*, 324 N.W.2d 216, 222 (Minn.1982), *cert. denied*, 459 U.S. 1172, 103 S.Ct. 818, 74 L.Ed.2d 1016 (1983). Waiver of *Miranda* rights must be knowing, intelligent, and voluntary.[2] *State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978). A district court must evaluate the totality of the circumstances to determine whether a defendant's waiver was voluntary. *Id.* We have set forth an extensive list of factors relevant to the totality of the circumstances. The analysis must take into account the defendant's age, maturity, intelligence, education, experience, ability to comprehend, lack of or adequacy of warnings, length and legality of detention, nature of the interrogation, physical deprivations, and access to counsel and friends. *Id.* When reviewing the district court's conclusion about voluntariness of a waiver, an appellate court evaluates the district court's findings of fact for clear error. *Johnson*, 463 N.W.2d at 533. The appellate court must make an independent subjective determination, however, as to whether the waiver of right to counsel was voluntary. *State v. Wilson*, 535 N.W.2d 597, 603 (Minn. 1995).

In assessing voluntariness, this court has focused heavily on both a defendant's education and his familiarity with the criminal justice system. We have found significant in previous cases that the defendant had been read his *Miranda* rights before the investigation at issue. *See, e.g., State v. Camacho*, 561 N.W.2d 160, 169 (Minn.1997) (indicating that defendant had had prior contacts with police in which he was informed of his rights); *State v. Ouk*, 516 N.W.2d 180, 185 (Minn.1994) (noting that 15–year–old suspect had been advised of his rights on at least three earlier occasions). In another case, the defendant's high school education and previous encounters with the criminal justice system were important to our conclusion that he had voluntarily waived his right to counsel. *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn. 1991).

The district court concluded that once Miller asked about an attorney, Sgt. Nelson and Sgt. Weston ceased all interrogation and began asking questions again only after Miller voluntarily reinitiated communication with them. In reaching its conclusion, the court found that Miller was 42 years old and had a high school education. In addition, the court found that Miller had been arrested several times, had his *Miranda* rights read to him before May 13, 1996, and had been convicted of third- and fourth-degree criminal sexual conduct. The court thus concluded that Miller made all statements to the police "freely and voluntarily and * * * not in violation of his Fifth Amendment privilege against self-incrimination."

Because the police interrogation on May 13 was taped in its entirety, we have a clear understanding of what happened. Miller was given a *Miranda* warning immediately after being arrested on May 13, and he indicated that he understood those rights. Moreover, Sgt. Nelson explained to Miller that he could not talk to him unless Miller reinitiated conversation, and Miller stated explicitly, "I'd like to exercise that option." Indeed, Miller acknowledged later in the interview that he had voluntarily waived his right to an attorney and that he understood he had the right to stop the conversation at any time. Contrary to Miller's claim on appeal, the police officers worked scrupulously to ensure that Miller reinitiated conversation voluntarily.

In addition to the police officers' explicit questions and Miller's clear answers, other facts demonstrate the validity of the waiver. Miller was not subject to any physical deprivations during the interrogation. The police did not question him for an excessive length

---

2. The voluntariness of a defendant's waiver of the right to counsel and the voluntariness of a defendant's statement or confession to the police are analytically distinct and must be proved separately, although both determinations utilize the same voluntariness standard. *Cf. State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978), and *State v. Pilcher*, 472 N.W.2d 327, 333–34 (Minn.1991).

of time, and they allowed him to use the restroom whenever he needed. Not only was he allowed to talk to his wife, but she also sat in on portions of the interrogation. We conclude that after invoking the right to counsel on May 13, Miller made a knowing, intelligent, and voluntary waiver of his right to counsel. Thus, the admission of testimony about and tapes of the May 13 interrogation did not violate his right to counsel under the Fifth Amendment.

### C. Invocation of the Right to Counsel on May 14

Miller claims on appeal that he also invoked his right to counsel on May 14. The district court made no findings or conclusions on this issue. Early that morning, Sgt. Nelson met with Miller at the jail to see if Miller was willing to continue the interrogation. Although Miller initially expressed concern about whether he had made the right decision in allowing Nelson to talk to him, he never mentioned an attorney and soon agreed that he would go with Nelson to the police station to talk some more. Later in the interrogation, Miller did admit that he had an unexpected visit the night before from a cousin who was an attorney, who told him not to talk to anyone about the case. As soon as Miller stated that he had talked to an attorney, Nelson clearly and explicitly inquired whether Miller had sought counsel or whether he was interested at that moment in having counsel present. Miller answered, "[a]t this time, no" and explained that it was probably in his best interests to talk to the police. We conclude that Miller did not expressly invoke the right to counsel during the May 14 interrogation, and that when Nelson offered him the opportunity to do so, he declined.

### III.

We next address whether Miller's statements to the police were voluntary under the Fourteenth Amendment's guarantee of due process. *See Camacho,* 561 N.W.2d at 169 (citing *Jackson v. Denno,* 378 U.S. 368, 385–86, 84 S.Ct. 1774, 1785–86, 12 L.Ed.2d 908 (1964)). A defendant's statement or confession is voluntary absent a

showing of coercive police activity. *Id.* (citing *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986)). The Fourteenth Amendment's voluntariness standard is identical to that employed to determine the voluntariness of a *Miranda* waiver. *State v. Williams,* 535 N.W.2d 277, 287 (Minn.1995); *cf. Linder,* 268 N.W.2d at 735; and *Pilcher,* 472 N.W.2d at 333–34. A district court assesses voluntariness by examining the totality of the circumstances. *Pilcher,* 472 N.W.2d at 333. The requisite factors include the defendant's age, maturity, intelligence, education, experience, and the ability to comprehend; the adequacy or lack of a warning; the length and legality of the detention; the nature of the interrogation; and whether the defendant was denied access to family and friends or deprived of physical needs. *Camacho,* 561 N.W.2d at 170 (citations omitted). When reviewing a district court's conclusion, an appellate court must make an independent determination based on the totality of the circumstances as to whether a defendant's statement was voluntary. *Id.; Pilcher,* 472 N.W.2d at 333.

Miller contends that all of his statements to the police were involuntary. The district court, however, concluded that all of Miller's statements were made "freely and voluntarily." We conclude that because Miller went to the police station of his own free will on May 10 and May 12 and was clearly not subject to any police coercion, his statements on those days were voluntary.

Our analysis of Miller's voluntary waiver of his right to counsel during the May 13 interrogation also leads to the inescapable conclusion that he made his statement to the police voluntarily. The record reveals myriad instances of Sgt. Nelson questioning Miller to determine whether he was making the statement voluntarily and Miller agreeing that he was. There is no evidence that Miller's will was overborne through threats or promises. In fact, Nelson refused to discuss possible sentences for the different degrees of homicide because it might appear as if he were making promises to Miller. As with their conservative and cautious approach to the issue of whether Miller had invoked his right to counsel, the officers' repeated inqui-

ry as to the voluntariness of Miller's statements was exemplary. We conclude that his statements during the May 13 interrogation were voluntary.

Sgt. Nelson followed the same procedure on May 14 to ensure that Miller was making a voluntary statement to the police. He again asked the same litany of questions that he did the day before. Miller likewise agreed that the police had made no promises or threats and stated several times that he was meeting with them voluntarily. We conclude that Miller's May 14 statement to the police was voluntary. Because we hold that all of Miller's statements were made voluntarily, their admission did not violate his due process rights under the Fourteenth Amendment.

## IV.

We next evaluate whether the district court admitted Miller's unrecorded statement to the police on May 10 and the unrecorded portions of the May 12 interview and the May 14 interrogation in violation of our rule in *State v. Scales.* 518 N.W.2d 587, 592 (Minn.1994). In *Scales,* we set forth the requirement that custodial interrogation, including information about rights and waiver of those rights, must be electronically recorded when it occurs in a place of detention. *Id.* Our first consideration, therefore, is to determine whether Miller was in custody when he made the unrecorded statements. If he was not, the *Scales* recording requirement does not apply. In our discussion of the applicability of *Miranda* warnings above, we set forth the standards under which the district court decides whether a suspect is in custody and an appellate court reviews that decision—would a reasonable person in the suspect's situation have understood that he was in custody. *Hince,* 540 N.W.2d at 823. We use the same standard here. *See Scales,* 518 N.W.2d at 592.

The district court concluded that a reasonable person in Miller's circumstance would not have believed he was in custody on May 10. On the evening of Friday, May 10, Miller and his wife voluntarily went to the police station to discuss his mother's death with Sgt. Weston. A reasonable person

whose mother had been killed would certainly anticipate that the police would seek to interview him, and nothing else in the record suggests that he was in custody. We conclude that because Miller was not in custody on May 10, the *Scales* recording requirement does not apply and thus the district court properly admitted testimony about Miller's statements that day.

Miller contends that Sgt. Nelson's testimony about their unrecorded conversation in the parking lot of the police station on May 12 was custodial interrogation and thus should have been suppressed. As we discussed extensively above, we concluded that Miller was not in custody on May 12. Because *Scales* applies only to custodial interrogation, our earlier determination is dispositive. Nelson's testimony about the May 12 conversation was therefore properly admitted.

Miller also claims that the failure to record the final 45 minutes of the May 14 interrogation constitutes a substantial violation of *Scales* and thus Sgt. Nelson should not have been allowed to testify about the unrecorded portion of the interview. Because Miller was unequivocally in police custody on May 14, all interrogation should have been recorded. *Id.* Under *Scales,* a court must determine the substantiality of a violation on a case-by-case basis "after considering all relevant circumstances * * * including those set forth in § 150.3(2) and (3) of the Model Code of Pre–Arraignment Procedure." *Id.* Miller cites subdivision (2)(a) of the Model Code, which provides that the violation shall be deemed substantial if it was "gross, wilful and prejudicial to the accused. A violation shall be deemed wilful regardless of the good faith of the individual officer if it appears to be part of the practice of the law enforcement agency or was authorized by a high authority within it." *See id.* at 592 n. 5.

The underlying rationale for our decision in *Scales* was to prevent factual disputes about the existence and context of *Miranda* warnings and any ensuing waiver of rights. *See Williams,* 535 N.W.2d at 289. The existing recordings from May 14 capture Sgt. Nelson reading Miller his rights and Miller

stating several times that he understood his rights. Miller does not claim that the 45–minute gap contained exculpatory evidence, or conversely, prejudicial evidence other than Nelson's testimony that Miller said he "planted" the pistol in his mother's nightstand. The term "planted" is innocuous in this context. Moreover, there is no evidence that Nelson deliberately failed to start another cassette or that the St. Paul Police Department had a practice of failing to tape suspects' statements. We conclude that the *Scales* violation on May 14 was not substantial and thus the district court properly admitted Nelson's testimony about the final 45 minutes of the interrogation.

## V.

Finally, we address Miller's claims regarding witness testimony. We focus first on the testimony to which defense counsel did not object at trial. Miller contends that Karen Thomas's testimony about Miller's failure to send the gift television to his aunt was evidence of a "bad act" and thus inadmissible under Minn. R. Evid. 404(b). He also asserts that the testimony of Charleen Fenick and Leslie Miller regarding their first reactions to the news of Ms. Miller's death was improper lay opinion testimony and thus was inadmissible under Minn. R. Evid. 701.

■ Failure to make a timely objection to the admission of evidence is a bar to appeal. Minn. R. Evid. 103(a); *State v. Landro*, 504 N.W.2d 741, 746 (Minn.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 380 (1994). If the admission, however, is plain error affecting substantial rights or constituting a fundamental error of law, it may be reviewed on appeal notwithstanding the failure to object. Minn. R.Crim. P. 31.02; Minn. R. Evid. 103(d); *Van Buren v. State*, 556 N.W.2d 548, 551 (Minn.1996). Our test for whether an evidentiary admission rises to the level of plain error is "whether there was or was not a reasonable likelihood that any error substantially affected the verdict." *Van Buren*, 556 N.W.2d at 551 (quoting *State v. Glidden*, 455 N.W.2d 744, 747 (Minn. 1990)).

■ Thomas's testimony about Miller's failure to send the television to his aunt was not error, much less plain error. Minnesota Rule of Evidence 404(b) prohibits the admission of evidence of other crimes, wrongs, or acts when the evidence is used solely to prove a person's character to show that he or she acted in conformity with that character. But testimony about a defendant's "bad acts" is admissible for other purposes. Character evidence that shows the strained relationship between the defendant and the victim is relevant to establish motive and intent and thus is admissible. *State v. Mills*, 562 N.W.2d 276, 285 (Minn.1997).

■ Admission of Charleen Fenick's and Leslie Miller's testimony about their belief that Miller had killed his mother does not rise to the level of plain error because there is no indication that this testimony substantially affected the outcome of the trial. The jury listened to the tapes of Miller's extensive statements to the police as well as to testimony from 29 witnesses for the state. The testimony included information about Miller's strained relationship with his mother, incriminating statements Miller had made to co-workers immediately before his mother's murder, and ballistics evidence. The evidence against Miller, although circumstantial, was substantial. Regardless of whether the testimony of Fenick and Leslie Miller was improper lay opinion testimony, admission of the testimony was not plain error.

■ Miller also asserts that the district court should have granted his motion for a mistrial after Thomas stated on defense cross-examination that Miller had past felonies. We do not reverse a district court's decision regarding a motion for mistrial absent an abuse of discretion. *State v. Long*, 562 N.W.2d 292, 296 (Minn.1997). As soon as Thomas mentioned Miller's criminal record, defense counsel immediately objected. The court sustained the objection and promptly instructed the jury to disregard Thomas's remark. When defense counsel later moved for a mistrial based on Thomas's testimony, the court denied the motion based on the timely instruction to the jury. We presume that jurors follow a judge's instructions. *See State v. Forcier*, 420 N.W.2d 884, 885 n. 1 (Minn.1988). In this situation, the

court's immediate curative instruction rectified any possible error. In addition, the court took extra steps to ensure that subsequent witnesses would not inadvertently discuss Miller's past convictions. Outside the presence of the jury, the court instructed Miller's ex-wife and cousin that they should not make reference to Miller's criminal record unless directly questioned about it. It is clear that the district court did not abuse its discretion in denying Miller's motion for a mistrial.

Affirmed.