STATE of Minnesota, Appellant,

v.

Kathleen Ann WIERNASZ, Respondent.

No. C0–97–1092.

Supreme Court of Minnesota.

Aug. 27, 1998.

Rehearing Denied Sept. 28, 1998.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Michael Richardson, Asst. County Atty., Minneapolis, for appellant.

William E. McGee, Hennepin County Chief Public Defender, Peter W. Gorman, Asst. Public Defender, Minneapolis, for respondent.

## OPINION

BLATZ, Chief Justice.

This is an appeal by the state of a pretrial order suppressing evidence in the prosecution of the defendant, Kathleen Ann Wiernasz, for second-degree intentional murder in the death of her just-born child. The issue is whether what otherwise would have been a noncustodial interrogation of Wiernasz became custodial, thereby requiring the giving of a *Miranda* warning, when the police began their questioning by telling Wiernasz about the results of a voluntary polygraph test she had just completed. Specifically, the police indicated that there was a 100% likelihood Wiernasz had been deceptive in responding to a question regarding whether she had done anything to cause her baby to stop breathing. Affirming the trial court's suppression order, the court of appeals concluded that the interrogation was custodial and that police therefore should have given Wiernasz a *Miranda* warning before questioning her. *State v. Wiernasz*, 1998 WL 15912 (Minn.App.1998). In independently reviewing the trial court's determination regarding custody and the need for a *Miranda* warning, *State v. Shoen*, 578 N.W.2d 708, 716 (Minn.1998), we hold that the police statement about the results of the lie detector test did not convert the interrogation into a custodial interrogation. We therefore reverse the decision of the court of appeals affirming suppression of the confession and remand to the trial court for further proceedings.

2 

In December of 1995, Wiernasz, a divorced mother of two teenagers, learned she was pregnant. In the following months, Wiernasz kept her pregnancy a secret, wearing a corset and loose clothing to conceal her condition. On July 18, 1996, paramedics were called to Wiernasz's Minneapolis house after her sister found her unconscious and the just-born baby dead. When paramedics arrived, they found the dead baby, which appeared to have been washed, in a paper bag.

Detectives Zimmer and VanSlyke, of the Hennepin County Sheriff's Office and Minneapolis Police Department respectively, interviewed Wiernasz in the Minneapolis homicide office on July 31, 1996. We are not concerned with Wiernasz's statements during that interrogation but with incriminating statements she made in a video taped interrogation that occurred at the station house on August 15, 1996.

The detectives made arrangements with Wiernasz to meet with them voluntarily on August 15 for a polygraph test and a second interview. Wiernasz was given the choice of coming to the station on her own or being picked up and driven there by a police officer. She chose the latter option. After the completion of the polygraph test, police took Wiernasz to the interview room, where she waited for approximately 15 minutes by herself before Detectives Zimmer and VanSlyke entered the room.

At the start of the interrogation, the detectives advised Wiernasz that they would tell her the results of the polygraph test but first they wanted to remind her that she was not under arrest, that no matter what happened during the interview they were going to drive her home afterwards, that she was free to leave whenever she wanted, and that they were not holding her in custody. Defendant acknowledged she understood.

The detectives then told Wiernasz that the polygraph test examiner had indicated that she had been 100% deceptive in responding to a question regarding whether she did anything to cause the baby to stop breathing. The detectives added that they understood there were reasons and they wanted to get to them and get matters resolved. Wiernasz then slid up to the table at the detectives'

request and they began their interrogation of her, ultimately obtaining incriminating statements from her, which we need not detail in this opinion. Later, after fingerprinting her and photographing her, the detectives took Wiernasz home. Eleven days later she was formally charged with murder in the second degree.

 The trial court first decided that the interrogation was noncustodial at the outset which we agree with. But then in suppressing the incriminating statements made on August 15, the trial court concluded that once the detectives told Wiernasz that the polygraph test indicated that she had lied when she denied having done anything to cause the baby to stop breathing, Wiernasz had reason to believe she was in custody to the degree associated with a formal arrest and therefore the detectives should have given her a *Miranda* warning. We disagree that the detectives' statements transformed the noncustodial interrogation into a custodial interrogation.

The court of appeals, citing as its authority our decisions in *State v. Champion*, 533 N.W.2d 40 (Minn.1995), and *State v. Rosse*, 478 N.W.2d 482, 484 (Minn.1991), agreed with the trial court and affirmed the suppression order. However, in *Champion* we held that if a station house interrogation is noncustodial at the outset and police do not change any of the circumstances of the interrogation during the interrogation, they may continue asking questions after a suspect makes a significant incriminating statement without first stopping and giving the suspect a *Miranda* warning provided that a reasonable person under the circumstances would not believe that he or she was in police custody of the degree associated with a formal arrest. But we cautioned that no "bright line rule" exists in determining whether a defendant is in custody. *Id.* at 43. Here the police did not change any of the circumstances of the interrogation during the interrogation. As in *Rosse*, we must then examine all the surrounding facts to determine whether there is a formal arrest or restraints comparable to those associated with a formal arrest and if that belief is

objectively reasonable. *Id.* at 484 (citations omitted).

■ In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court created a prophylactic bright-line rule requiring police to give a warning of rights before subjecting any person to "custodial interrogation." The *Miranda* rule, which is designed to implement the Fifth Amendment protection against compelled self-incrimination, uses an objective test of custody: whether the identified circumstances would prompt a reasonable person to believe that he or she was under formal arrest or restraint in freedom of movement to a degree associated with formal arrest. *Stansbury v. California*, 511 U.S. 318, 324, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam); *Berkemer v. McCarty*, 468 U.S. 420, 422, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

In applying the *Miranda* test, the Supreme Court has held that the mere fact that the interrogation occurs at the police station does not by itself require a determination that the questioning was custodial in nature. *See, e.g., Oregon v. Mathiason*, 429 U.S. 492, 493, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam) (holding that parolee was not in custody when he voluntarily submitted to questioning at the police station, even though the questioning by the police occurred in a room with the door closed); *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (holding that suspect was not in custody simply because questioning occurred at the police station or because person questioned was a prime suspect).

On the other hand, the mere fact· that questioning occurred in a suspect's home does not by itself mean that the questioning was not custodial in nature. *Compare Beckwith v. United States*, 425 U.S. 341, 345–47, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (holding that taxpayer was not in custody when IRS agents conducted an interview of him at his home) *with Orozco v. Texas*, 394 U.S. 324, 325–26, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (holding that suspect was in custody when several police officers questioned him in his bedroom at 4:00 a.m.).

In other cases, the Supreme Court has held that a person detained pursuant to a routine traffic stop was not in custody, *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), and that a man on probation was not in custody during a required meeting between him and his probation officer, *Minnesota v. Murphy*, 465 U.S. 420, 429–34, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

As the Supreme Court made clear .in *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), whether a defendant was "in custody" at the time of interrogation is a mixed question of law and fact, requiring the appellate court to apply the controlling legal standard to historical facts as determined by the trial court.[1] In other words, an appellate court reviews a trial court's findings of historical fact relating to the circumstances of the interrogation pursuant to the clearly erroneous test[2] but makes an independent review of the trial court's determination regarding custody and the need for a *Miranda* warning. *See State v. Shoen*, 578 N.W.2d at 716.

There is no real dispute in this case concerning the facts relating to the circumstances of the interrogation, which was video taped pursuant to our decision in *State v. Scales*, 518 N.W.2d 587 (Minn.1994).

In independently reviewing the question regarding whether defendant was in custody at the time of the interrogation, we rely upon the Supreme Court's decision in *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). In that case, the defendant, whom the police suspected of committing the crime under investigation, voluntari-

---

1. *See, also, Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (stating that an appellate court should review the trial court's findings of historical fact relating to the probable cause determination for clear error under the clearly erroneous standard but should review de novo the issue of probable cause).

2. The "clearly erroneous" test for review of the findings of a trial judge is described in detail in *State v. Paulson*, 290 Minn. 371, 373, 188 N.W.2d 424, 426 (1971).

ly came to the police station. The police expressly told him he was not under arrest. However, they did tell him that they suspected him of committing the offense. Further, they confronted him with false evidence about having discovered his fingerprints at the scene of the crime. Finally, at the close of the interview, during which the defendant made incriminating statements, the police allowed him to leave without hindrance. The Court there concluded that the interrogation was noncustodial in nature. It stated:

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

The officer's false statement about having discovered Mathiason's fingerprints at the scene was found by the Supreme Court of Oregon to be another circumstance contributing to the coercive environment which makes the *Miranda* rationale applicable. Whatever relevance this fact may have to other issues in the case, it has nothing to do with whether respondent was in custody for purposes of the *Miranda* rule.

429 U.S. at 495–96, 97 S.Ct. 711.

The Supreme Court more recently expanded upon the irrelevance of mere focus upon a suspect in *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).[3] There, the Court stated that "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." 511 U.S. at 324, 114 S.Ct. 1526. The Court stated further:

> An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. [Citations omitted]. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her " 'freedom of action.' " [Citation omitted]. Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case. In sum, an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

511 U.S. at 325, 114 S.Ct. 1526.

In *Mathiason* the police investigation had not only focused upon the defendant but the police told the defendant so and also con-

---

**3.** The mere focus test, which stated that the "in custody" requirement was met if police interviewed a person who was the focus of the investi-gation, was rejected in *Beckwith v. United States*, 425 U.S. at 345, 96 S.Ct. 1612.

fronted him with false evidence about having discovered his fingerprints at the scene of the crime. Nonetheless, because the defendant voluntarily came to the police station, because the police told him he was not under arrest and because at the close of the interview he left without hindrance, the Supreme Court concluded that the defendant was not in custody during the interrogation. In this case, as the defendant in *Mathiason* did, Wiernasz voluntarily came to the police station, was told by the police that she was not under arrest, and at the close of the interview was allowed to leave without hindrance. Wiernasz was not restrained to a degree associated with a formal arrest. Here, as in *Mathiason*, the detectives suspected Wiernasz of committing the offense, told her of their suspicions, and confronted her with inadmissible evidence (in *Mathiason*, the false evidence about the fingerprints, here the inadmissible evidence of the polygraph test results).[4] Furthermore, as in *Mathiason*, Wiernasz's interview was designed to produce incriminating responses.

In summary, we conclude that in examining all of the surrounding facts, that the use by the police in this case of the results of the polygraph test to induce Wiernasz to confess did not convert a noncustodial setting into a custodial setting requiring the giving of a *Miranda* warning. Nothing in our opinion in *State v. Champion,* 533 N.W.2d 40 (Minn. 1995), or *State v. Rosse,* 478 N.W.2d 482 (Minn.1991), relied upon by the court of appeals, mandates a different conclusion.

Reversed and remanded to the trial court for further proceedings.

---

4. In *Wyrick v. Fields,* 459 U.S. 42, 48, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) (per curiam), the Court rejected the suggestion that the use of polygraph test results in questioning a suspect, although not necessarily rendering a response involuntary, is "inherently coercive." The use of the polygraph test results in this case, in our opinion, was no more inherently coercive than the officers' confronting the defendant in *Mathiason* with the false evidence. In fact, while we have condemned police use of lying in interrogating suspects, *State v. Thaggard,* 527 N.W.2d 804 (Minn.1995), we have approved the use of polygraph test results in interrogating suspects, *State v. Schaeffer,* 457 N.W.2d 194 (Minn.1990), and *State v. Jungbauer,* 348 N.W.2d 344 (Minn.1984).