STATE of Minnesota, petitioner,
Appellant,

v.

Jeremy Daniel TIBIATOWSKI,
Respondent.

No. C2–97–834.

Supreme Court of Minnesota.

March 4, 1999.

Michael Hatch, Minnesota Attorney General, James B. Early, Assistant Attorney General, St. Paul, Todd Webb, Clay County Attorney, Moorhead, for appellant.

John M. Stuart, State Public Defender, Sharon Jacks, Assistant State Public Defender, Minneapolis, for respondent.

## OPINION

STRINGER, J.

On January 31, 1996 two men entered the Travel Mart convenience store in Moorhead, Minnesota. One of the men carried a shotgun and pumped the stock of the gun as if chambering a round of ammunition. As he did so he told the employee on duty to "give me the money." The employee took all the cash from the register and gave it to the other man. The men fled with about $500 in cash, some checks and some cigarettes. None of the eyewitnesses were able to give more than a general description of the robbers.

Several days later, respondent Jeremy Daniel Tibiatowski was incarcerated in the Cass County Juvenile Detention Center in Fargo, North Dakota, on charges unrelated to this appeal when his Juvenile Services case manager asked him if there was anything he wanted to tell her. Respondent thereupon confessed to his involvement in an armed robbery. He later sought to suppress his confession as the product of a custodial interrogation in violation of *Miranda.* Fol-

lowing an omnibus hearing, the trial court denied the motion to suppress. The parties stipulated the facts and respondent was found guilty by the trial court as charged. The court of appeals reversed the pre-trial order, holding that the statements were the product of a custodial interrogation. We disagree and reverse the court of appeals.

Respondent was taken into custody and placed in the Cass County Juvenile Detention Center in Fargo, North Dakota on February 3, 1996, after having been "on the run" from a juvenile detention facility. Respondent had been in trouble on numerous prior occasions and was in the legal and physical custody of the North Dakota Department of Corrections Division of Juvenile Services (DJS). His DJS case manager was Human Relations Counselor Connie Wheeler. She testified at the omnibus hearing that during the year that she had been his case manager she had spoken with him approximately 30 times, both on the telephone and in person. Upon learning that he was back in custody after being on the run, Wheeler let him know that she would come to see him at the detention center to discuss placement, an upcoming hearing, and to "talk to him about where [he was and] what he'd be[en] doing when he was on run."

Meanwhile, Moorhead law enforcement authorities learned on February 11, 1996 that Chris Karau and a juvenile, C.L.H., were involved in the Travel Mart robbery. Karau was identified as the driver of the vehicle used to leave the scene. Both Karau and C.L.H. were interviewed by police on the morning of February 13, 1996 and identified the person who carried the shotgun as "Jeremy" or "Bud." Neither C.L.H. nor Karau knew Jeremy's last name at the time of the interview, but both later identified respondent as "Bud."

Early in the afternoon of February 13, 1996, Detective Richard Norwig of the Moorhead police department phoned Wheeler and left a message that Minnesota "wanted a hold on Jeremy." She returned Norwig's call but he was not in his office and she did not speak with him. Between 4:30 and 4:45 p.m. on that same day, February 13, Wheeler arrived at the detention center to visit respondent as previously scheduled. Although she suspected that respondent had been "involved in something" while on the run, Wheeler did not know what, nor did she know why the police wanted to talk to him. She had heard a radio news report of the Travel Mart robbery and wondered if it might have involved one of the juveniles in her custody, but she never thought of respondent as a possibility.

Wheeler further testified at the omnibus hearing that during their interview respondent seemed "bothered" and was more quiet than usual. After she and respondent discussed the upcoming hearing and his placement options, Wheeler asked respondent "if there was anything he wanted to tell" her. Respondent then "blurted out" that he had been involved in a crime and described the Travel Mart robbery, naming both Karau and C.L.H. Wheeler was "shocked" by the confession, and surprised to learn that respondent had used a gun since "it's not been part of his background to ever have weapons." She asked a few clarifying questions about the robbery, but when respondent started asking questions about his legal status, she told him that he needed to talk to an attorney. At no time during the interview did Wheeler give respondent a ˙Miranda warning. Wheeler reported respondent's confession to Detective Norwig the following day.

When asked at the omnibus hearing why he had cooperated with Wheeler, respondent stated that he "wanted to be honest with her and get the show on the road." He also agreed that it was part of his "obligation as a person on probation" to be honest with Wheeler. Although given the opportunity, he did not disagree with Wheeler's description of their conversation.

Respondent was certified for trial as an adult and charged with aggravated robbery in the first degree in violation of Minn.Stat. § 609.245, subd. 1 (1998). He moved for suppression of his statement to Wheeler on the basis that it was a product of a custodial interrogation and was not preceded by a Miranda warning. Following an omnibus hearing at which Wheeler and respondent were the only witnesses, the trial court de-

nied the motion to suppress, holding that, while the "the parties agree that [respondent] was in custody," Wheeler was not a law enforcement officer and her questioning of respondent was therefore not an interrogation under *Miranda.*

The parties stipulated to the facts pursuant to *State v. Lothenbach,* 296 N.W.2d 854 (Minn.1980), preserving respondent's right to appeal the trial court's pre-trial order denying the motion to suppress. *Id.* at 858. The trial court found respondent guilty, and he was sentenced to the presumptive sentence of 58 months.

The court of appeals analyzed only the issue of interrogation, stating that "the parties do not dispute" the issue of custody. *State v. Tibiatowski,* C2-97-834, 1998 WL 74260, *1 (Minn.App. Feb.28, 1998). In reviewing the trial court's pretrial suppression order, the court of appeals held that the element of interrogation was met since Wheeler was the equivalent of a probation officer and hence an agent of the police, and that her question was reasonably likely to elicit an incriminating response. *Id.* at *2.

The trial court and court of appeals bypassed the issue of custody in the understanding that there was a stipulation by the parties to that effect, but the stipulation does not necessarily lead to the conclusion that respondent's custody status at the detention center was custody for purposes of Wheeler's question to him in the context of *Miranda.* The stipulation merely recites that respondent "was being held in custody"—and there is no doubt that he was because he was in the Cass County Juvenile Detention Center. But he was in custody for a different offense for which he had been previously adjudicated; he was not in custody for the robbery offense. Thus the issue is whether custody is custody for all purposes or whether the custody must relate to the offense for which the detainee is being interrogated. The logical extension of *Miranda* would appear to favor the latter.

■ *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prohibits the admission in evidence of statements made by a suspect during "custodial interrogation" absent procedural safeguards to protect the suspect's rights under the Fifth Amendment. *Id.* at 444, 86 S.Ct. 1602. *Miranda* involved several consolidated cases, each involving "incommunicado interrogation of individuals in a police-dominated atmosphere." *Id.* at 445, 86 S.Ct. 1602. The *Miranda* court was "concern[d] * * * primarily with this interrogation atmosphere and the evils it can bring." *Id.* at 456, 86 S.Ct. 1602. To protect defendants from coercive police tactics, the Court held:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the [Fifth Amendment] privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way * * * *. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Id.* at 444, 86 S.Ct. 1602. The Court went on to state that "we do not purport to find all confessions inadmissible * * *. Any statement given *freely and voluntarily without any compelling influences* is, of course, admissible in evidence." *Id.* at 478, 86 S.Ct. 1602 (emphasis added).

In *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), the Supreme Court reversed our holding that a confession given by a probationer to his probation agent should be suppressed under *Miranda.* *Id.* at 440, 86 S.Ct. 1602. The Court again emphasized that the concern behind the *Miranda* decision was the possibility that confessions would be coerced from a suspect:

> Custodial arrest is said to *convey to the suspect a message that he has no choice but to submit to the officers' will and to confess.* * * * [T]he coercion inherent in custodial interrogation derives in large measure from an interrogator's insinua-

tions that the interrogation will continue until a confession is obtained.

*Id.* at 433, 104 S.Ct. 1136 (emphasis added, citation omitted).

█ The question whether a suspect incarcerated on an unrelated offense is *de facto* in custody for all *Miranda* purposes has not been directly addressed by the U.S. Supreme Court. While federal courts are divided on the issue,[1] we believe the better ruling, based on the underlying concern expressed by the Supreme Court in *Miranda* for the *coercive* influence of custody in an interrogative setting, is that custody for an unrelated offense is not custody for all purposes under *Miranda.* The trial court must look to the circumstances of the custody and determine whether it would cause a reasonable person to feel compelled or coerced to confess to the offense for which the interrogation is being conducted. Resolving the issue on the basis of whether the suspect would reasonably believe he was not free to leave, under these circumstances, is not enough because a suspect already in custody is obviously not free to leave, but the custody might well have none of the coercive effects concerning the Court in *Miranda.* We hold that under the circumstances here where there is no evidence of restraint on the suspect's freedom other than that to which the suspect was already subject by reason of his custody for an unrelated offense, the suspect is not in custody for purposes of *Miranda.* There is no evidence that respondent here was subject to any additional restraint when he confessed, and therefore the necessary ingredient of coercion in *Miranda* was missing. Respondent was therefore not "in custody" for purposes of *Miranda* when he confessed. *See*

*Cervantes v. Walker,* 589 F.2d 424, 427 (9th Cir.1978).

We next turn to the question of whether Wheeler's question to respondent—if there was anything he wanted to tell her—is interrogation in the nature of "express questioning [as well as] any words or actions on the part of the police * * * that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *accord State v. Jones,* 566 N.W.2d 317, 327 (Minn. 1997). In *Innis* offhand remarks between police officers expressing concern for the safety of children in the area prompted a suspect to lead police to the weapon he had used to commit a crime. *Innis,* 446 U.S. at 294–95, 100 S.Ct. 1682. Given the context of the remarks, the Court held that they were not reasonably likely to elicit an incriminating response, and the incriminating evidence the remarks evoked was admissible. *Id.* at 303., 100 S.Ct. 1682

█ Although *Innis* dealt with statements rather than questions, the Court made it clear that even express questions are not always interrogation. For example, routine booking questions are exempt from *Miranda* requirements. *Innis,* 446 U.S. at 300–02, 100 S.Ct. 1682; *accord State v. Hale,* 453 N.W.2d 704, 707 (Minn.1990). In order to rise to the level of interrogation, the questioning, whether express or implied, must be *"reasonably likely* to elicit an *incriminating* response." *Id.* at 301, 100 S.Ct. 1682 (emphasis added). The analysis of the questioning must focus on the perspective of the suspect, not of the police. *Id.*

---

1. In *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), the Supreme Court held that evidence given during a "routine tax investigation" by a suspect, incarcerated for an unrelated offense, was inadmissible without a *Miranda* warning. *Id.* at 4, 88 S.Ct. 1503. Some courts have interpreted *Mathis* as making incarcerated suspects "question-proof" without presence of counsel after once invoking that right for a prior, unrelated offense. *See, e.g., United States v. Green,* 592 A.2d 985 (D.C.1991), *cert. granted,* 504 U.S. 908, 112 S.Ct. 1935, 118 L.Ed.2d 542 (1992), *vacated and cert. dismissed,* 507 U.S. 545, 113 S.Ct. 1835, 123 L.Ed.2d 260 (1993). For these courts, incarceration is *de facto* "custody"

for Miranda purposes. But the majority of circuits have rejected the *"de facto* custody" reading of *Mathis* and adopted an "additional restraint" test for determining what constitutes custody for *Miranda* purposes. *See, e.g., Garcia v. Singletary,* 13 F.3d 1487, 1492 (11th Cir.1994); *Leviston v. Black,* 843 F.2d 302, 303 (8th Cir. 1988). Numerous state courts have followed suit. *See, e.g., State v. Deases,* 518 N.W.2d 784, 789 (Iowa 1994); *see also* Laurie Magid, *Questioning the Question–Proof Inmate: Defining* Miranda *Custody for Incarcerated Suspects,* 58 Ohio St. L.J. 883, 936–37 (1997) ("at least 17 state courts" hold that incarceration does not always constitute custody for Miranda purposes).

■ "Subtle compulsion" or the mere possibility that a question will elicit an incriminating response is insufficient to trigger the *Miranda* doctrine. *Innis* at 303, 100 S.Ct. 1682; *Arizona v. Mauro,* 481 U.S. 520, 528, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). As the Supreme Court noted, the interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis* at 300, 100 S.Ct. 1682. In *Arizona v. Mauro,* a suspect was tape-recorded while talking to his wife in the presence of a police officer after having invoked his right to counsel. *Mauro,* 481 U.S. at 522, 107 S.Ct. 1931. Since there were no "compelling influences, psychological ploys, or direct questioning" of the suspect, the presence of the police officer alone did not transform the discussion into interrogation and the recorded statements were admissible as evidence. *Id.* at 529, 107 S.Ct. 1931.

■ The warning required by *Miranda* must be given by all those who use the power of the state to elicit an incriminating response from a suspect, regardless whether they are law enforcement personnel. *See Estelle v. Smith,* 451 U.S. 454, 467, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (holding results of court-ordered psychiatric examination given by an independent psychiatrist inadmissible during the penalty phase of a capital trial). But a "general obligation to appear [before a law enforcement agent] and answer questions truthfully" is insufficiently coercive to require a *Miranda* warning. *Murphy,* 465 U.S. at 427, 104 S.Ct. 1136. In *Minnesota v. Murphy,* the Supreme Court held that an interview between a probationer and his probation agent was noncustodial and therefore *Miranda* did not apply. *Id.* at 431, 104 S.Ct. 1136. The Court nevertheless went on to reject the argument that statements made during a "routine interview" were compelled by the probation officer's position as a law enforcement agent. Instructive to our inquiry here, the Court states:

> Many of the psychological ploys discussed in *Miranda* capitalize on the suspect's unfamiliarity with the officers and the envi-

ronment. *Murphy's regular meetings with his probation officer should have served to familiarize him with her and her office and to insulate him from psychological intimidation that might overbear his desire to claim [his Fifth Amendment] privilege.*

*Id.* at 433, 104 S.Ct. 1136 (emphasis added). The similarity to the circumstances here is striking. Here too, respondent was familiar with the setting and Wheeler was well known to him. The record here is similarly devoid of psychological intimidation, as perhaps best demonstrated by respondent's own testimony that he "wanted to be honest with [Wheeler] and get the show on the road."

■ Minnesota applies federal constitutional standards through a totality-of-the-circumstances test to determine the voluntariness of a suspect's statement, focusing on whether the overall effect of the circumstances would be enough to overpower the will of the suspect. *State v. Pilcher,* 472 N.W.2d 327, 333 (Minn.1991). Some element of coercion is required for a statement to be deemed involuntary, and the nature of the interrogation is one factor to examine. *State v. Hince,* 540 N.W.2d 820, 824 (Minn.1995).[2] A comment from a jailer to an incarcerated suspect that "you are the only one who knows who did it" was held not to be interrogation since it was part of a conversation initiated by the suspect and hence lacked the necessary measure of coercion. *State v. Jackson,* 351 N.W.2d 352, 355 (Minn.1984). Likewise, an incriminating statement given in response to a routine booking question about a cut on a suspect's hand was not made in response to interrogation and was hence exempt from the requirements of *Miranda. Hale,* 453 N.W.2d at 707.

■ Our test then for whether respondent was subjected to the interrogation the Supreme Court sought to protect him from under *Miranda* is whether it was first, "questioning initiated by law enforcement officers," *Miranda,* 384 U.S. at 444, 86 S.Ct.

---

**2.** Other factors may include "the age, maturity, intelligence, education, and experience of the accused; the ability to comprehend; the adequacy or lack of a warning; length and legality of the detention; * * * and whether the accused was denied access to friends and family, or deprived of physical needs." *Id.* (citing *State v. Thaggard,* 527 N.W.2d 804, 808 (Minn.1995).

1602, and second, whether under a totality of circumstances it would be "reasonably likely to illicit an incriminating response," *Innis,* 446 U.S. at 301, 100 S.Ct. 1682. We hold that neither element was met.

 Clearly Wheeler was not acting as a law enforcement officer at the time she asked respondent whether he had anything he wanted to tell her. Evidence introduced at the omnibus hearing indicated that Wheeler's relationship with respondent was limited to matters relating to "the legal care, custody, and control of the children [she] work[ed] with" and did not include either conditions of probation or law enforcement duties. We are not persuaded to any degree by the repeated mischaracterization by respondent's attorney of Wheeler as a probation officer and cases cited by respondent holding that probation agents can under some conditions be considered law enforcement officers are wholly inapposite. It is equally clear from the record that Wheeler did not visit respondent as an agent for or at the request of the Moorhead police as respondent contends. The meeting between respondent and Wheeler had been scheduled well before the Moorhead police phoned Wheeler about their interest in respondent, even if the police leaving such a phone message could under any circumstance deem Wheeler a deputy or agent of the police. Indeed, when Wheeler met with respondent and he "blurted out" his confession, she did not know why the Moorhead police were interested in him.

As to the nature of Wheeler's question—whether there was anything respondent wanted to tell her—it was open-ended and non-suggestive, and bore none of the elements of coercion or compulsion underpinning the Supreme Court's protections in *Miranda.* It was nothing more than a general inquiry. It was not intended to illicit an incriminating response in a police-dominated atmosphere condemned in *Miranda,* nor did it "reflect a measure of compulsion beyond that inherent in custody itself" of concern in *Innis.* Respondent perhaps put it best when he testified that the reason he cooperated with Wheeler was that he "wanted to be honest with her and get the show on the road."

We hold that respondent was not in custody when he made his incriminating statement to Wheeler about his involvement in the crime, nor did Wheeler's question to respondent constitute interrogation. We therefore reverse the court of appeals and reinstate the trial court's conviction.

Reversed.