**In the Matter of the WELFARE OF G.S.P.**

No. C7–99–1028.

Court of Appeals of Minnesota.

April 25, 2000.

John M. Stuart, State Public Defender, Charlann E. Winking, Assistant Public Defender, Minneapolis, for appellant G.S.P.

Mike Hatch, Attorney General, St. Paul, and John J. Muhar, Itasca County Attorney, Michael J. Haig, Assistant County Attorney, Grand Rapids, for respondent State of Minnesota.

Considered and decided by PETERSON, Presiding Judge, G. BARRY ANDERSON, Judge, and HUSPENI*, Judge.

## OPINION

DORIS OHLSEN HUSPENI, Judge.

Appellant, a juvenile, alleges that the trial court erred in refusing to suppress statements made by appellant and in determining that the state had proven appellant's guilt beyond a reasonable doubt. We conclude that appellant's statements were inadmissible because they were taken in violation of his rights under *Miranda v. Arizona*, and we reverse.

## FACTS

On the second day of the school year in September 1998, 12–year–old G.S.P., a seventh grader at North Middle School in Grand Rapids, apparently forgot his backpack in the locker room after a football game. That evening, a school custodian found the backpack while cleaning the boys' locker room. Looking for identification, the custodian opened the bag and discovered a BB gun. The custodian took the bag with the gun to the assistant principal's office and left a note on the bag.

The next morning, James Wheeler, the assistant principal, found the bag on his chair with the note attached. Wheeler called Grand Rapids police officer Brian Johnson, explaining that a custodian found

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

a backpack with a weapon in it. Wheeler asked Johnson to get to school as soon as possible. Officer Johnson, a licensed officer of 17 years, was working in his third year as a school liaison officer assigned to the Grand Rapids schools.

Officer Johnson, in uniform, arrived at Wheeler's office. The two examined the backpack and weapon. Wheeler, in looking through the backpack, found items that identified the owner as G.S.P. Wheeler asked Johnson to accompany him to G.S.P.'s classroom. G.S.P. was taken out of class and accompanied Officer Johnson and Wheeler back to Wheeler's office. G.S.P. was not told why he was called out of class and felt he had no choice but to accompany them. G.S.P. asked what it was about and Wheeler said he would explain it in the office.

G.S.P. was interviewed in Wheeler's office in the presence of Wheeler, Officer Johnson, a school counselor, and a teacher. According to Wheeler, the interview lasted for "[m]aybe up to an hour." G.S.P. felt nervous because he did not know what was wrong. Wheeler told him that he had no choice but to answer the questions. Wheeler did not tell G.S.P. that he could talk to his parents, that he had a right to an attorney, or that he was free to leave. Officer Johnson did not communicate anything about whether G.S.P. was under arrest or in custody. The only thing Johnson communicated was that he was going to have a tape recorder on.

The taped interview began with Wheeler telling G.S.P. that he was going to ask a couple of questions and then turn it over to Officer Johnson. Wheeler noted that the custodian found the backpack in the boys' locker room where G.S.P. had left it. Officer Johnson asked G.S.P. why he left his backpack behind, to which G.S.P. responded that he just forgot it. Wheeler noted that there was a pair of pants with some money in the back pocket and inquired, "Is there something else in here that probably shouldn't be in here?" G.S.P. responded, "Not that I know of." Wheeler inquired

twice more whether there was anything else that was inappropriate in the bag, to which G.S.P. twice responded, "No."

At this point, Wheeler revealed the gun and asked G.S.P. what kind it was. G.S.P. responded that he forgot all about it; he did not know it was in there. G.S.P. appeared very upset and testified that he felt kind of scared when Wheeler pulled the gun out of the backpack. Responding to questions, G.S.P told Wheeler how to load the BB gun. The gun was not loaded and had been in the backpack for about a week since G.S.P. had taken it over to a friend's house. G.S.P. had not shown the gun to anybody at school.

Wheeler noted that the student handbook policy calls for expulsion for bringing a pistol to school. Wheeler explained that G.S.P. would have to deal with some issues with school, with law enforcement, and with his family; he had made a mistake and things were not going to be very good but would eventually get better. The school counselor noted that G.S.P. would be suspended for 10 days regardless and that the counselor would have to get in touch with G.S.P.'s parents. A sobbing G.S.P. reiterated that he did not even know the gun was there and that there were no BBs in the backpack. Wheeler explained that those were the rules and that it was a safety issue. The school counselor noted that G.S.P. had nothing in his discipline file. Wheeler called G.S.P.'s father and told G.S.P. his father would be there in half an hour.

At that point, Officer Johnson explained that he had to follow up on some points. Officer Johnson stated:

> I have the statute book out here in front of me and it's *Crimes Against the Public Safety and Health* that has to do with dangerous weapons and dangerous weapons at school. Stating here that it's a dangerous weapon – *Whoever uses or brandishes a replica BB gun on school property; whoever possesses, stores or keeps a replica of a firearm or*

*BB gun on school property* * * * so you're gonna be charged with that — do you understand this? Ok. I'll talk to your folks about this, too. What I do is I make a report of what has happened and turn that over to the County Attorney and he decides what or if any charges will be pressed and what happens is you get a notice in the mail and your parents — if there are charges — and then they'll be a court date set. (inaudible) make a recommendation. I always do that in my reports. [G.S.P.] — people who are truthful and honest and sincere and remorseful about things — I put that in my report. I can tell you are that way today.

* * * *

I would like to ask you some questions about this gun. You don't have to answer them if you don't want to. That's up to you — or you can wait till your dad gets here or whatever you feel more comfortable — or if you wanna talk now that's fine, too. You mind if I ask you questions? You've been pretty honest about the counselor and principal here. This (inaudible) BB gun — is that yours or your parents?

In response to Officer Johnson's questions, G.S.P. explained that the gun was his, it had been given to him as a birthday present when he was nine or ten, and that he used it for pop cans and "stuff." He did not have any ammunition, he used the gun when he visited his friend about a week or week and a half earlier, and had transported it in his backpack. He did not take the gun out of his backpack when he packed his school things because he had forgotten all about it. He was a football player, he had not had any fights or disagreements lately, had not been threatened, and had no intention to use the gun. He was not in a gang, did not fear gangs, and did not know any kids in gangs. A sobbing G.S.P. agreed that he had no intention of using the gun other than "plinkin' away" at his friend's house or his house. The school counselor noted that

"[i]t seems like everything adds up that he forgot about it." Officer Johnson stated that they would end the statement there.

When G.S.P.'s father arrived at school, he was told about the gun and asked to sign a waiver. He was told that if he signed the waiver G.S.P. would be expelled until February 1st and that if he did not sign the waiver the matter would have to go before the school board and G.S.P. would probably be expelled for the entire year. Taking into consideration his son's welfare, the father signed the waiver.

Subsequently, a juvenile delinquency petition was brought, charging G.S.P. with a gross misdemeanor for possession of a BB gun on school property in violation of Minn.Stat. § 609.66, subd. 1d(b) (1998). G.S.P. denied the charge and requested an omnibus hearing and trial. The district court held a combined omnibus hearing and trial. After five witnesses provided testimony, the court denied G.S.P.'s motion to suppress, concluding that G.S.P. was not in custody when interrogated and that his statements were voluntary because there was no coercive action. The trial court found G.S.P. delinquent, concluding the statute did not require the state to prove knowing possession and that the state had proven beyond a reasonable doubt that G.S.P. "did possess, keep or store a bb gun" on school property in violation of Minn.Stat. § 609.66, subd. 1d(b). The court stayed the delinquency adjudication and disposition for six months pending good behavior.

G.S.P. appealed. The state moved to dismiss the appeal, arguing that the trial court's order was non-appealable and that the appeal was moot. This court denied the motion to dismiss as moot "at this time" (the six-month continuance of the adjudication had not expired at the time of this court's order and, therefore, "appellant may still suffer the adverse consequences of an adjudication of delinquency"). The motion to dismiss as non-appealable was deferred to the panel considering the appeal on its merits.

## ISSUES

1. Is there a justiciable controversy?

2. Was G.S.P. subject to custodial interrogation?

## ANALYSIS

### I.

■ The state argues that this appeal should be dismissed for lack of a case or controversy because there was no final order. A juvenile has a right of appeal from adverse final orders. Minn. R. Juv. P. 21.03, subd. 1. In this case, the trial court stayed adjudication for delinquency and disposition for six months to be dismissed providing good behavior in the interim. The state contends that, absent entry of adjudication, there is no appealable, final, adverse order. The juvenile rules, however, specifically define final orders to include "continuance without adjudication and disposition in delinquency proceedings pursuant to Minnesota Statutes § 260.185, subd. 1(a) or (b)." Minn. R. Juv. P. 21.03, subd. 1(A)(2). Accordingly, the order here is appealable under the juvenile rules.[1]

■ The state also argues that the appeal should be dismissed because G.S.P. has not suffered any injury.

> [w]hen, pending appeal, an event occurs that makes a decision on the merits unnecessary or an award of effective relief impossible, the appeal should be dismissed as moot.

*State v. Brown,* 597 N.W.2d 299, 305 (Minn.App.1999) (quoting *In re Application of Minnegasco,* 565 N.W.2d 706, 710 (Minn.1997), *review denied* (Minn. Sept. 14, 1999)). In this case, over six months have passed since the May 1999 order. However, the file before this court was transmitted prior to the expiration of the six-month period and nothing in the record readily confirms that G.S.P. has in fact maintained good behavior. Further, the

trial court found the charged offense proved beyond a reasonable doubt, and it is "undeniably the fact that probation officers and other court services personnel would see" the minor's "juvenile records in the future" should the minor be convicted of a future crime. *In re Welfare of L.B., Jr.,* 404 N.W.2d 341, 344 (Minn.App.1987). Additionally, because the circumstances present in this case are capable of repetition, yet evading review, we are reluctant to consider the matter moot. *Id.* Accordingly, we shall review the merits of the appeal.

### II.

■ G.S.P. argues that the district court erred as a matter of law when it failed to suppress admissions made by G.S.P. while being questioned in Wheeler's office because the interrogation was a custodial one and conducted without a Miranda warning. When reviewing pretrial orders on motions to suppress evidence, this court "may independently review the facts and determine, as a matter of law, whether the district court erred in suppressing—or not suppressing—the evidence." *State v. Harris,* 590 N.W.2d 90, 98 (Minn.1999).

■ To safeguard an uncounseled individual's Fifth Amendment privilege against self-incrimination, suspects subject to custodial interrogation must be given the Miranda warning — they have the right to remain silent, anything they say may be used against them in court, and they are entitled to the presence of an attorney. *Thompson v. Keohane,* 516 U.S. 99, 107, 116 S.Ct. 457, 462, 133 L.Ed.2d 383 (1995) (citing *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)). "Juveniles as well as adults are entitled to be apprised of their constitutional rights according to the dictates of Miranda." *State v. Loyd,* 297 Minn. 442, 445, 212 N.W.2d 671, 674 (1973) (citing *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)).

---

**1.** Our conclusion concerning the appealability issue is consistent with that recently reached in *In re Welfare of M.R.C.,* No. CX–99–536, 1999 WL 1261720 (Minn.App. Dec.28, 1999).

■ "Custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Thompson,* 516 U.S. at 107, 116 S.Ct. at 463 (citing *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612). "The warning required by *Miranda* must be given by all those who use the power of the state to elicit an incriminating response from a suspect, regardless whether they are law enforcement personnel." *State v. Tibiatowski,* 590 N.W.2d 305, 310 (Minn.1999).

■ When applying the custodial interrogation standard, courts first determine whether the defendant was "in custody" by considering the surrounding circumstances, and then turn to the nature of the interrogation itself to determine whether the questioning was reasonably likely to elicit an incriminating response. *See id.* at 309; *State v. Edrozo,* 578 N.W.2d 719, 724 (Minn.1998). Determining whether the defendant was "in custody" involves considering all of the circumstances, including the officer's and the defendant's behavior throughout the interrogation. *See State v. Wiernasz,* 584 N.W.2d 1, 4–5 (Minn.1998); *State v. Miller,* 573 N.W.2d 661, 670–71 (Minn.1998).

■ No "bright line rule" exists in determining whether a defendant was in custody. *Wiernasz,* 584 N.W.2d at 2. Determining whether a person was in custody for Miranda purposes is a mixed question of law and fact involving a two-part analysis:

> [F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of

the degree associated with a formal arrest."

*Thompson,* 516 U.S. at 112, 116 S.Ct. at 465. An appellate court reviews a trial court's factual findings of circumstances under the clearly erroneous standard, but independently reviews the trial court's determination regarding custody. *Wiernasz,* 584 N.W.2d at 3; *Miller,* 573 N.W.2d at 670.

The trial court did not make factual findings in this case. But neither are the facts in dispute. Then 12–year–old G.S.P. was removed from his seventh-grade class and accompanied by Wheeler and Officer Johnson to Wheeler's office. When G.S.P. asked what it was about, Wheeler said he would explain it in the office. Once in the office, Officer Johnson told G.S.P. that the tape recorder would be on. At the outset of the recording, Wheeler explained that he would ask a couple of questions and then turn it over to Officer Johnson. G.S.P. was told that he had no choice but to answer the questions. G.S.P. had never before been to the principal's or assistant principal's office for discipline, nor had he been in trouble with the law or questioned by the police.

■ In applying the objective test, this court must ask whether a reasonable person in G.S.P.'s situation would have believed that he was in custody. *Miller,* 573 N.W.2d at 670. Proper constitutional analysis of custodial interrogation should focus primarily on the perspective of the suspect, rather than the subjective intent of the police. *Edrozo,* 578 N.W.2d at 725. The test is not whether a reasonable person under the circumstances would believe they were not free to leave, but whether a reasonable person under the circumstances would believe they were in police custody of the degree associated with formal arrest. *State v. Champion,* 533 N.W.2d 40, 43 (Minn.1995).

■ Application of the objective test to all of the surrounding circumstances in this case convinces us that from the per-

spective of G.S.P. a reasonable person would believe he was in custody.

Importantly, Officer Johnson did not tell G.S.P. that he was not under arrest or that he was free to leave. *See Miller*, 573 N.W.2d at 670 (important to custody analysis that suspect told by police he was not under arrest); *State v. Budke*, 372 N.W.2d 799, 801 (Minn.App.1985) (18–year–old told prior to police questioning that he could leave principal's office at any time). Indeed, Wheeler told G.S.P. that he had no choice but to answer their questions.

■ "Custodial arrest" involves a "coercive influence" that conveys to the suspect "a message that he has no choice but to submit to the officers' will and to confess." *Tibiatowski*, 590 N.W.2d at 308 (quoting *Minnesota v. Murphy*, 465 U.S. 420, 433, 104 S.Ct. 1136, 1145, 79 L.Ed.2d 409 (1984)). In *Murphy*, the U.S. Supreme Court ruled that questioning by a probation officer was not custodial in nature because of the absence of psychological intimidation due to the defendant's familiarity with probation meetings. *See Tibiatowski*, 590 N.W.2d at 309 (discussing *Murphy* in some detail). In this case, the record indicates that G.S.P. was in an unfamiliar environment, as he had never been in trouble before and had never been called to the office of the principal or assistant principal. Unlike *Murphy*, the record here is not devoid of psychological intimidation raising Fifth Amendment concerns.

■ The location of the interview and the questioners' titles are not determinative considerations. The fact that the questioning here occurred in school does not lessen the importance of Fifth Amendment safeguards. *See Wiernasz*, 584 N.W.2d at 3 (noting that whether interrogation occurs at police station or at home is not determinative). Further, the presence of a police officer alone does not transform a discussion into a custodial interrogation. *Tibiatowski*, 590 N.W.2d at 310. But where, as here, a uniformed officer summons a juvenile from the classroom to the office and actively participates in the questioning, the circumstances suggest the coercive influence associated with a formal arrest. *See id.* at 308–09; *Wiernasz*, 584 N.W.2d at 3–4 (discussing necessity of coercive aspect).

■ Further, Officer Johnson told G.S.P. that the interview would be tape recorded. Under Minnesota law, custodial interrogations must be electronically recorded where feasible. *State v. Scales*, 518 N.W.2d 587, 592 (Minn.1994). The underlying rationale for the decision in *Scales* was to prevent factual disputes about the existence and context of Miranda warnings and any ensuing waiver of rights. *Miller*, 573 N.W.2d at 674. The fact that Officer Johnson told G.S.P. at the outset that the interview would be recorded is strongly suggestive of a custodial interrogation.

■ An examination of the nature of the interrogation itself reinforces the conclusion that G.S.P. was subject to custodial interrogation. The standard is whether the questioning, express or implied, is "reasonably likely to elicit an incriminating response from the suspect." *Tibiatowski*, 590 N.W.2d at 309 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980)). Here, Wheeler repeatedly asked G.S.P. whether he had something "inappropriate in his backpack." After G.S.P. responded in the negative, Wheeler revealed the gun and told G.S.P he would have to deal with law enforcement. Officer Johnson quoted from a criminal statute and explained the process by which G.S.P. would likely be charged. Officer Johnson questioned G.S.P.'s intentions and involvement with gangs. The record reveals that G.S.P. was questioned for potential criminal conduct, not just for misbehavior in school. The questions were reasonably likely to elicit a criminally incriminating response.

■ The state notes that G.S.P.'s admissions first occurred during questioning from Wheeler and argues that even if

G.S.P. was "in custody," he was not entitled to a Miranda warning with regard to Wheeler's questioning. We disagree. Rather than making two discrete inquiries, Wheeler and Officer Johnson were working together. At the outset, Officer Johnson told G.S.P. that he would be recording the interrogation, and Wheeler told G.S.P. he had a couple questions and then would turn it over to Officer Johnson. Further, near the beginning of the interrogation, Officer Johnson inquired, "How come you left it behind?" Rather than two discreet interviews, the record suggests one concerted effort. Regardless, a Miranda warning must be given by all that use the power of the state to elicit criminally incriminating responses. *Tibiatowski,* 590 N.W.2d at 310.

 Our conclusion that a Miranda warning was required in this case is based on the specific facts presented here and is intended to have narrow application. This case is not about whether a student must be given a Miranda warning when summoned to the office of a school principal or assistant principal to be questioned about discipline problems. The district court undoubtedly was correct in noting that school officials have the right and the authority to make reasonable inquiry of a student concerning conduct that has taken place on school premises. *Cf. Boynton v. Casey,* 543 F.Supp. 995 (D.Maine 1982) (student challenging expulsion had no right to *Miranda* warning because interrogation was by school officials in furtherance of disciplinary duties). Further, there is nothing improper about law enforcement participating in school disciplinary affairs. But where a peace officer interrogates a student in custody in a manner likely to elicit criminally incriminating responses, the student must be afforded Fifth Amendment protection. *Cf. In re Gault,* 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527 (1967) (suggesting that juveniles may have a greater need for Fifth Amendment protection than adults).

Because the state has not indicated the presence of any available fallback prosecutorial position without G.S.P.'s admissions, we see no possibility of reversal and remand for a new hearing. Reversal is the only appropriate result.

Because we conclude that G.S.P. was subject to a custodial interrogation requiring a Miranda warning, we need not reach other arguments advanced concerning the voluntariness of the statement and the necessary level of criminal intent.

## DECISION

Because our independent review of the surrounding circumstances leads to the conclusion that G.S.P. was subject to custodial interrogation requiring a Miranda warning, we reverse the district court's decision. The state's motion to dismiss is denied.

**Reversed; motion denied.**